Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Sidney I. Schenkier | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 99 C 4651 | DATE | 7/31/2001 |
| CASE TITLE | Darius Scott vs. Larry G. Massanari, Commissioner of Social Security | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER.** The Court grants the Commissioner's motion for summary judgment [doc. # 27] and denies the plaintiff's motion for reversal and/or remand [doc. # 20] pursuant to Sentence 4, 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter a final judgment pursuant to Fed.R.Civ.P. 58. This case is terminated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | Document Number |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | JUL 3 1 2001 date docketed | |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | | 29 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING 01 JUL 31 AM 11:58 | 7/31/2001 date mailed notice |
| | courtroom JJK deputy's initials | Date/time received in central Clerk's Office | JJK mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

DARIUS SCOTT, )
)
Plaintiff, )
)
v. ) No. 99 C 4651
)
LARRY G. MASSANARI,[1] ) Magistrate Judge Schenkier
Commissioner of Social Security, )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER[2]

Plaintiff, Darius Scott ("Darius"), who is ten years old, seeks judicial review pursuant to the Social Security Act, 42 U.S.C. § 405(g), of a final decision by the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI") childhood benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1383(c)(3). Darius seeks summary judgment reversing the Commissioner's decision denying his claim for SSI or, in the alternative, remanding the case to the Commissioner for further proceedings. For the reasons set forth below, the Court grants the Commissioner's motion for summary judgment (doc. # 27) and denies Darius's alternative motion for summary judgment (doc. # 20).

I.

### A.    Procedural History.

On October 1, 1993, Darius's mother, Gwendolyn Jones ("Ms. Jones"), filed an application for SSI childhood benefits on behalf of Darius (R. 47), alleging that he had been disabled due to hyperactivity since September 29, 1990 (R. 38) – one month after his birth. A

---

[1] Larry G. Massanari, the acting Commissioner of Social Security is substituted as defendant in place of William A. Halter, the former Acting Commissioner, pursuant to Fed.R.Civ.P. 25(d)(1).

[2] By the parties' consent, on August 20, 2000, this case was reassigned to this Court, pursuant to 28 U.S.C. § 636(c)(1) and Northern District of Illinois Local Rule 73.1(b), to conduct any and all proceedings and to enter final judgment.



determination that Darius was not disabled was made on June 20, 1994 (R. 41); that decision was affirmed on August 15, 1994, after a request for reconsideration was filed by Ms. Jones (R. 49). A request for a hearing by an Administrative Law Judge ("ALJ") was filed on November 3, 1994 (R. 52), and both Darius and his mother appeared with counsel for a hearing on May 24, 1996. The ALJ denied the application for Darius's SSI on August 21, 1996,[3] and the appeals counsel denied review of the ALJ's decision on May 13, 1999 (R. 4), thereby rendering the ALJ's decision the Commissioner's final decision. 20 C.F.R. § 416.481. A complaint was then timely filed in the United States District Court for judicial review.

B. **Factual Background.**

Darius was born on August 29, 1990 (R. 26, 38), and he was five years old at the time that the ALJ made his determination (R. 16). Darius lives with his mother and four siblings in an apartment (R. 16); his mother and father never married, but Darius's father is involved in the household and provides support for Ms. Jones and the children (R. 16, 96). However, Darius and two brothers share only thirty-nine dollars per month in financial child support from their father, who is currently receiving SSI benefits himself (R. 25).

---

[3] On August 22, 1996, one day after the ALJ's decision, the Personal Responsibility and Work Opportunity Act went into effect. That statute contained amendments to 42 U.S.C. § 1383c(A)(3), which made the standard for eligibility for childhood disability benefits more stringent. *See, e.g., Zamora v. Massanari*, 2001 WL 766374, *7 (N.D.Ill. July 6, 2001). Those amendments apply to all cases that had not been finally adjudicated by August 22, 1996. *Id.* at *7; *see also Lishman v. Chater*, 1996 WL 650437, at *7 (N.D. Ill. Mar. 6, 1996).

In this case the ALJ denied Darius's application for child SSI on August 21, 1996, and thus applied the pre-Act standard then in effect. But a benefits claim "is not considered finally adjudicated if a request for either administrative or judicial review is pending." *Zamora* at *7 (citing *Jamerson v. Chater*, 112 F.3d 1064 (9th Cir. 1997) and *Quinones v. Chater*, 117 F.3d 29 (2nd Cir. 1997)). However, courts have recognized that where "the ALJ had determined correctly that the Plaintiff was not entitled to benefits under the former, more lenient standard, it was unnecessary to review the plaintiff's claim under the newer, more stringent standard." *Id.* at *7 (citing, *Jamerson* at 1068); *see also Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997) (a claimant properly denied benefits under the pre-Act standard also would be denied benefits under the 1996 amendments). Thus, we analyze the ALJ's decision under the more lenient standard that he applied.

Ms. Jones reports that several family members, including Darius's siblings, have had medical and psychological problems, including language and/or learning problems (R. 96). Darius was "born healthy," is not currently on any medication (R. 32),[4] is not under any treatment by a doctor or psychologist (R. 32), and has never been hospitalized overnight (R. 26, 72). But, according to Ms. Jones, Darius was the product of a "difficult, unplanned and unwanted pregnancy," leaving her depressed and bedridden for several months, especially when she was told that the pregnancy "could result in a miscarriage" (R. 97). Ms. Jones reports that Darius's brother, Dony'a, has been diagnosed with hyperactivity and autism (R. 68, 110).

1. *Darius's social, behavioral, and cognitive development.*

Ms. Jones noticed that Darius had irregular sleeping habits "[w]hen he was a baby" and at five months, he could not sit still in his walker (R. 26). Although Darius could babble at age 2 weeks and was using a walker at age four months (R. 97), Ms. Jones noticed that he was delayed in his communication skills. While other children were able to form sentences, at age two, Darius could only point and cry in order to convey his needs; at ages three and four, Darius only could form three to four word broken (described as "gibberish" and "babbling") sentences which were difficult to understand (R. 7, 69, 96).

Ms. Jones felt that Darius was hyperactive since the age of five months after noticing that he would constantly "run" while in his walker, yet he was unable to sleep even when he was tired (R. 6-7). At age two, Ms. Jones noticed that Darius did not appear to understand certain questions posed to him, while other children his age were able to understand the questions. "[H]e (Darius) would just nod yes to a lot of things, whatever you said he would just nod yes" (R. 27).

---

[4] Although there is documentation that Darius was receiving iron supplements for anemia at age three (R. 72), no mention of any current medications being given is recorded in recent medical exams and/or school documents.

At age three, Ms. Jones reported that she had "a great deal of problems getting him (Darius) to bed," often requiring three to four hours before his jumping and crawling would subside and he would finally fall asleep for six to seven hours (R. 68, 96). Darius was able to nap occasionally, sometimes for as long as three hours (R. 96).

Ms. Jones also encountered difficulty feeding Darius, noting that he was "constantly getting up from the table, walking around with his food, or jumping or dancing or singing, just moving around in some way" (R. 69). Although Darius enjoyed watching television, he could not sit and watch an entire program (R. 69). His speech was "poor," "unclear," and "difficult to understand," and he often cried and had "temper tantrums" when other family members or friends did not understand what he was trying to say (R. 68-69).

As he grew older (age four), Ms. Jones noticed that Darius could not concentrate long enough to put four piece puzzles together (while other children were able to accomplish the task "right away") and often came home crying, unable to get along with other children and often "picking fights" with them (R. 27-28, 68). In addition, Darius' behavior created dangerous situations: he almost hung himself when he jumped from a chair after wrapping a clothes line around his neck; he received an electric shock from a wall socket; and he often ran out into the street, even when told not to do so (R. 28, 95). As a result of this impulsiveness, he required constant supervision when outdoors (R. 28-29).

Darius continues to have difficulty communicating with other children and adults, using sentences that are "jumbled up" and continues to point and use gestures to convey his needs, often crying in frustration because others cannot understand him (R. 30-31, 33, 35-36). He is now enrolled in a developmental kindergarten and appears to be doing fine academically.[5]

---

[5] No grades have been given and Darius continues to be recommended for Special Education classes, but Darius appeared to be progressing in the ongoing goals set by his teachers as expressed in the Progress Reports (R. 123-140).

4

Darius will most likely continue in a special education first grade.[6] A letter from his teacher dated May 3, 1999, stated that Darius had difficulty sitting still in school and getting along with his classmates and in a group setting, but he worked well when he was one-on-one with his teacher (R. 144).

   2.   *Medical Background.*

Darius was evaluated at the University of Chicago's Department of Psychiatry and Pediatrics between February 15, 1994 and April 26, 1994, for a Parent-Infant Development Service Diagnostic Evaluation ("PIDS evaluation"). This exam revealed that Darius exhibited mostly rudimentary play with some aggressive play, but that he had a "bright" affect (R. 99). In addition, the examiners noted that Darius "spoke very little, with poor articulation, and appeared not to understand questions" (R. 99).

Darius's developmental functioning was evaluated using the McCarthy Scale of Children's Abilities, Peabody Picture Vocabulary Test Revised-Form L and the Test of Early Language Development-2 ("Wakschlag exam") (R. 79-81, 95-103). These tests revealed that although Darius had "significant delays in both receptive and expressive language skills," he was able to compensate by using gestures and facial expressions to "greatly facilitate his ability to learn" and communicate (R. 81, 100). His overall functional development was described as "somewhat below other children his age" (R. 100). Specifically, his motor skills were at the 45th percentile, his general cognitive index places him below the 1st percentile and his verbal scale was below the 1st percentile as compared with other children his age (R.103). The testers attributed Darius' low performance on some of the tests to his "lack of ability to understand

---

[6] Although school records indicate that Darius had been recommended for continued Special Education (R. 114-147) classes, Ms. Jones testified that she was unable to determine for sure where his education would resume after kindergarten because the program was discontinued, and the Board of Education had not informed the schools of future plans as of the date of the administrative hearing (R. 32-33).

5

questions and task demands, as well as his limited verbal ability" (R. 100). Finally, the testers noted that although Ms. Jones reported a pattern of overactivity, Darius did not exhibit this type of behavior during the testing and the testers attributed these behaviors to environmental rather than constitutional factors (R. 100-101).

Dr. Townsend, who performed a pediatric consultative examination on April 30, 1994 ("1994 Exam"), observed that Darius "was climbing all over the room," but noted that Darius "acted his age with the exception of the fact that he seemed to show no fear or respect for his mom," and he would listen to his mother only if told to do so by the doctor (R. 74). In addition, Dr. Townsend noticed that Ms. Jones provided "very very little limit setting" with respect to Darius (R. 73). Dr. Townsend's clinical impression was hyperactivity (R. 74).

An Individualized Functional Assessment ("IFA") was performed on June 6, 1994, by Dr. Hersmeyer, a psychiatrist, who found no evidence of limitation on cognitive, communicative, motor, and social development but found moderate limitations in personal/behavioral development with adequate attention span and age appropriate activities of daily living (R. 76-78). Additionally, Dr. Hersmeyer found that Darius' impairments do no meet or functionally equal a listed impairment.

On June 1, 1995, Jane Nofer and Catherine Lord performed a Psychological Evaluation ("1995 Evaluation"). Darius received a general cognitive ability ("GCA") score of 69, a verbal cluster score of 68, and a nonverbal cluster score of 75. This evaluation found that Darius was "currently functioning at the upper end of the mild range of mental retardation" (R. 111, 113). However, the evaluators stated that Ms. Jones felt that Darius was improving. They also stated that although Darius' attention and impulsivity were "clearly problematic," he was "easily redirected" and recommended further specialized education (R. 113).

## C. The ALJ's Decision.

The ALJ applied the four-step sequential evaluation assessment for children as outlined in 20 C.F.R. § 416.924 (1995). The first step requires that the ALJ determine whether or not the claimant has engaged in substantial gainful activity. *Id.* § 416.924(b). Here, the ALJ found that Darius had not engaged in any substantial gainful activity since his alleged disability onset date of September 29, 1990.

Since the ALJ found that Darius had not engaged in any substantial gainful activity, the ALJ proceeded to Step two of the sequential evaluation, involving a determination of whether Darius had a "severe" impairment or combination of impairments. *Id.* § 416.924(c). The ALJ found that Darius had impairments of hyperactivity with some language, speech and cognitive delays with "moderate limitations in his communicative and personal/behavioral developments" (R. 17). But the ALJ opined that even with this combination of impairments, Darius did not meet or equal the level of severity required under the definition of disability in a child: Darius "does alright academically in school" and continues to improve, and when evaluated by psychologists on June 1, 1995, "the psychologist described the claimant's developmental delays as mild" (R. 16).[7]

Because the ALJ found that Darius' impairments did not meet the "severe" standard under the definition of disability at Step 2, the ALJ was required to determine at Step 3 if Darius had an impairment that met or medically equaled a listed impairment in Appendix 1 of Subpart P of Part 404 ("the Listings"). *Id.* § 416.924(d). The ALJ decided that Darius' impairments do not meet or equal in severity any listed impairment. His written decision mentions the psychological

---

[7] After the ALJ's determination, the Chicago Board of Education submitted a Triennial Psychological Evaluation Report on July 22, 1997, which stated that Darius demonstrated "strengths in the verbal skills, in his desire to learn, and in his social skills," and that he got along well with his peers (R. 145).

7

examination performed at the University of Chicago, which noted that Darius was functioning at the upper end of the mild range of mental retardation. In addition, the ALJ considered the evidence provided by these same psychologists who believed that "Darius' difficulties with attention and impulsivity are clearly problematic," but also stated that Darius was "very redirectable and it appears that his teacher was also able to work with him well in his special education" (R. 17). Therefore, the ALJ reasoned, "the claimant's impairments do not meet or equal in severity any Listed Impairment" (R. 17).

The ALJ next considered whether Darius met Step 4 of the sequential evaluation: whether the claimant has an impairment or combination of impairments that is of comparable severity to one that would disable an adult. *Id.* § 416.924(f). The ALJ found that Darius did not meet this standard, referring to evidence that Darius was improving in school, that his language was improving, and that he did not appear "significantly limited in his cognitive, motor, social or concentration developments" (R. 17). In addition, the ALJ noted that Darius was active socially; could dress himself; and he was sound physically, with a good appetite and good sleeping habits (R. 17). Furthermore, the ALJ found that although Darius had trouble concentrating and continued to fight with children at times, the ALJ noted that Darius had made some improvements in these areas (R. 16-17).

Having applied the four-step sequential analysis, the ALJ concluded that Darius failed to meet the test of disability for child disability benefits and denied Darius' application for SSI.

## II.

Judicial review of the ALJ's decision is governed by 42 U.S.C. § 405(g), which states that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1998).

In reviewing the Commissioner's decision, "the evidence in the Record is a primary function of an ALJ, and one to which the district court owes great deference." *Herron v. Bowen*, No. 88 C 4685, 1989 WL 39824, *4 (N.D.Ill., April 20, 1989). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (7th Cir. 1971). The Court cannot "decide facts anew, reweigh the evidence, or substitute [its] own judgment" for that of the Commissioner. *Herron v. Shalala*, 19 F. 3d 329, 333 (7th Cir. 1994). If the record contains substantial evidence to support the ALJ's findings, the reviewing court must affirm, unless there has been an error of law. *Erhart v. Secretary of Health and Human Services*, 969 F. 2d 534, 538 (7th Cir. 1992).

Although great deference is afforded to an ALJ's determination, the ultimate decision "must be based upon a fair and impartial presentation of all the medical evidence that is credible [and] supported by clinical findings." *Taylor v. Schweiker*, 739 F. 2d 1240, 1243 (7th Cir. 1984) (ALJ failed to address two relevant reports by two physicians and gave no reason for the omission; therefore, case remanded). The ALJ is not required to address every piece of evidence in the record, but meaningful appellate review requires that the ALJ articulate reasons for rejecting certain facts that may not support the ALJ's finding and why that evidence is less convincing. *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982).

### III.

In this case, the plaintiff challenges the ALJ's finding that Darius's impairments do not meet the requirements of Listing 112.05 for mental retardation. In addition, the plaintiff believes that the ALJ's findings are contrary to the evidence of record, are not supported by substantial evidence, and that the ALJ failed to minimally articulate the reasons for crediting or rejecting

9

evidence of disability by ignoring a medical finding of mild mental retardation. For the reasons set forth below, the Court rejects the plaintiff's challenges.

### A. There is substantial evidence to support the ALJ's determination that Darius's impairments do not meet the requirements of Listing 112.05D or 112.05F at Step 3.

Plaintiff argues that the record discloses evidence that Darius suffers from mild mental retardation, based on the standardized psychological tests of the 1995 Evaluation, and that this evidence, along with the ALJ's finding that Darius suffers from moderate deficits in his personal/behavioral development and in communication as a result of hyperactivity, satisfy Subsection D and Subsection F(2) of Listing 112.05 (Pl. Mem. at 5-8). The Commissioner, on the other hand, argues that a definitive diagnosis of mental retardation was not made by any of the physicians in the record, and that the evidence does not support such a diagnosis (Def. Mem. at 5-9).

Listing 112.05 defines mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning." 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.05. The level of severity required for this disorder can be met by Subsection D, which requires a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant limitation of function," or by Subsection F which requires "a marked impairment in age-appropriate cognitive/communicative function, documented by medical findings and standardized psychological tests and a physical or other mental impairment imposing additional and significant limitations of function." *Id.* The claimant has the burden of proof in establishing that a claimant's impairment meets or is equivalent to a Listing. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999).

The 1995 Evaluation of Darius yielded a GCA score of 69, a verbal cluster score of 68 and a nonverbal cluster score of 75. Darius' GCA score and verbal cluster scores clearly fall into the IQ range of standardized psychological tests required in Subsection D-F ("the subsections"). Indeed, the ALJ noted that Darius "functions at the upper end of the mild range of mental retardation." (R. 17).

However, while this evidence satisfied the first prong of Subpart D, a claimant must show that his impairment matches *all* of the criteria set forth in the Listing in order to establish that his impairments are *equivalent* to a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1989). Moreover, "[a]n impairment that manifests only some of those criteria [of a Listing], no matter how severely, does not qualify." *Id.* at 530. Moreover, the Seventh Circuit has held that IQ alone does not satisfy the test for mental retardation. *Fisher v. Bowen*, 869. F.2d 1055 (7th Cir. 1989) (concluding that although claimant had IQ score of 62, decision of the lower court to deny claimant's application for DIB upheld on basis that substantial evidence supported determination that claimant did not satisfy second prong of definition for mental retardation). And it is here that Darius's claim fails.

Both Subsection D and Subsection F of the Listing require "a physical or other mental impairment imposing additional and significant limitations of function." 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.05. An additional limitation that is considered "significant" has been held to require that the impairment be "another distinct diagnosable impairment" that is "more than slight or minimal but less than severe." *Hall v. Apfel*, 122 F.Supp.2d 959, 966 (N.D.Ill. 2000).

Although at first blush it appears that Darius' "moderate deficits" satisfy prong two of the Listing, there is substantial evidence that Darius' hyperactivity is not "distinct" in relation to his other impairments. During the PID's Evaluation, the evaluators noted that Darius' low

performance on the tests could be attributed to his lack of ability to understand questions and task demands, as well as his limited verbal ability. The ALJ noted that Darius had difficulty socially because of his language and cognitive problems, which in turn have lead to his anxiousness and hyperactivity (R. 17). This explanation is supported by the evidence, and substantiates the ALJ's finding that Darius' verbal cluster IQ of 68 and his GCA IQ score of 69, along with Darius' moderate deficits, are not distinct deficits and thus do not satisfy *both* prongs of the Listing.

The ALJ found that Darius was doing well in his special education classes (R. 123-140) and was increasing his vocabulary (R. 17). In addition, evidence that Darius continues to be healthy and interact appropriately with peers, teachers, and examiners supported the ALJ's conclusion that Darius was improving in both his motor and social skills (R. 17, 74). The ALJ acknowledged Darius's difficulty with attention and impulsivity, but cited the psychologist's evidence that Darius was "easily redirectable" and that his teachers were able to work with him well, to substantiate his findings that Darius's communication skills were improving.

Even if Darius has impairments distinct from the his IQ scores, Plaintiff's argument that Darius's "moderate deficits in his personal/behavioral development and in communication as a result of hyperactivity" satisfies the second prong of the subsections fails (Pl.'s Mem. at 6). The ALJ acknowledged that Darius does have moderate deficits; however, he also believed that Darius did not seem significantly limited in his cognitive, motor, social or concentration developments and was, in fact, "improving" (R. 17). Those findings are substantially supported by the evidence. The ALJ's findings were consistent with the medical evidence, which showed that Darius's problems with understanding and verbal communicating were improving; that he

was able to compensate for his lack of verbal skills; and that his lack of attentiveness and control were more of a problem with his mother than when in a school setting.

Thus, the ALJ was entitled, on this record, to conclude that Darius' IQ scores, coupled with his other deficits, do not meet the definition of mental retardation as required in Listing 112.05.

**B.  There is substantial evidence to support the ALJ's findings at Step 4 that Darius' impairments are of "comparable severity" to those that would disable an adult.**

At Step 4, the ALJ concluded that Darius' impairments of hyperactivity with language, speech, and cognitive delays were not of "comparable severity" to those which would disable an adult (R. 18). For the reasons discussed below, the Court finds, after careful review, that there is substantial evidence to support the ALJ's findings at Step 4.

In his decision, the ALJ recognized that "comparable severity" under the old standard for determining child disability benefits meant that a child's impairment so limited his ability to function independently and effectively in an age-appropriate manner that the impairment and resulting limitations was comparable to those that would disable an adult. *See Zamora v. Massanari*, No. 99 C 371, 2001 WL 766374, *6 (citing 20 C.F.R. § 416.924(a)). The ALJ's conclusions that Darius had only "moderate limitations in his communicative and personal/behavioral developments" (R. 17) is supported by substantial evidence in the record. Dr. Townsend's report noted that although Darius was hyperactive, he was "playful and acted his age with the exception…that he seemed to show no fear or respect for his mom," yet, when Darius was directed by the interviewer to follow Ms. Jones' commands, Darius would then do so (R. 74). In addition, Dr. Hersmeyer also identified hyperactivity but found no evidence of

limitation in Darius' cognitive, communicative, or motor development with moderate functional impairment in Darius' personal/behavioral developments (R. 76-77).

Although the Wakschlag exam revealed that Darius exhibited significant delays in both his receptive and expressive language skills, with a General Cognitive Index and Verbal Scale Score that placed him at or below the 1st percentile for children his age (R. 80), the examiners noted that Darius compensated for these deficits by demonstrating an intent to communicate with those around him by using "good social skills" and "gestures and facial expressions to indicate his needs" (R. 81). These examiners consistently identified Darius' functional ability to overcome his impairments and perform academically and socially in a special education setting, a setting where Darius would have more one-on-one attention and where Darius has proven to be most successful (R. 81, 101, 113).

The ALJ found that "the claimant has had some difficulties socially and in school because of his language and cognitive problems" (R. 17), but it appears that the claimants condition was not "severely limiting" because he was: (1) "still active socially even though he [had] some occasional problems"; (2) he could "dress himself"; (3) he was "sound physically and had never been injured"; (4) his "appetite and sleeping habits [were] good"; (5) he was "improving in school"; and (6) his "language [was] improving" because he could say "5 to 6 word sentences" (R. 17).

It is not a reviewing court's prerogative to "decide facts anew" or "substitute [its] own judgment" for that of the Commissioner. *Herron*, 19 F.3d at 333. While there are some findings by the ALJ that are somewhat puzzling, they do not affect the integrity of the ruling. For example, the ALJ's conclusion that Darius' sleeping habits are "good" is hard to square with Ms. Jones' testimony that Darius required at least 3-4 hours prior to falling asleep for approximately

5-6 hours at a time (R. 68, 94). Nevertheless, Darius' erratic sleeping patterns were addressed by both Dr. Townsend, who noted that it was Ms. Jones who put Darius to sleep at midnight (while his siblings went to sleep by 11 or 12 p.m.) because "he does not have to go to school" (R. 73), and Dr. Wakschlag, who felt that since Darius was able to maintain a sleep schedule on occasion, a more structured routine around bedtime would incorporate this ability into his daily routine. This evidence supports the ALJ's finding that Darius's sleep patterns do not constitute an impairment.

In addition, the ALJ's conclusion that Darius was "improving in school" and "in his language abilities" is supported by the evidence. The ALJ found that Darius' ability to recognize letters, say 5 to 6 word sentences and to communicate nonverbally at the age of 5, meant he had only "moderate" limitations. To have a "comparably severe" impairment, a child must not be able "to engage in age-appropriate activities...school and academics...and relationships" (R. 15). The evidence does not show an inability by Darius to engage in age-appropriate activities (in a special education setting) at the time of the administrative hearing.

In his decision, the ALJ specifically cites examples of how Darius is improving with respect to his moderate deficits. To support his final conclusion regarding Darius's cognitive abilities, the ALJ pointed to his ability to recognize letters, say 5-6 word sentences, and communicate using strong, non-verbal skills. In addition, the ALJ found that Darius's concentration skills were improving. The ALJ stated that although Darius continues in special education, Darius performs well academically; and, although he has a short attention span, he is easily redirectable (R. 16-17). Socially, the ALJ noted that although Darius had trouble cooperating and sharing with other children, there is evidence that Darius played with other children and that he continues to be active with others (R. 16-17).

Although the ALJ's decision here is not in all respects a model of clarity, the decision gives sufficient direction as to the ALJ's analysis so as to permit the Court to "discern the validity of his recovery." *Zamora*, 2001 WL 766374, at *12. Moreover, the claimant has cited no evidence showing how Darius is "significantly limited in his cognitive ability." *Roderer v. Sullivan*, 908 F.2d 975 (7th Cir. 1990) ("in order to qualify for child's disability benefits, [the claimant] must be able to prove that [the] impairments rendered [the claimant] disabled at or before the time of the 22nd birthday"). The failure to articulate a sufficient evidentiary basis upon which the ALJ could have found a disability means that the court must affirm where there is substantial evidence to support the Commissioner's final decision. *See generally Herron*, 19 F.3d at 333; *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997) (Although court believed ALJ conducted marginal hearing and improperly considered evidence outside the record in determining extent of claimant's disability, there was substantial evidence to support ALJ's ultimate findings because the Court could "track the ALJ's reasoning regarding the evidence."). "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

## CONCLUSION

For the reasons set forth above, the Court grants the Commissioner's motion for summary judgment (doc. # 27) and denies the Plaintiff's motion for reversal and/or remand (doc

# 20) pursuant to Sentence 4, 42 U.S.C. § 405(g). The Clerk of the Court is directed to enter a final judgment pursuant to Fed.R.Civ.P. 58. This case is terminated.

**ENTER:**

**SIDNEY I. SCHENKIER**
**U.S. Magistrate Judge**

**Dated: July 31, 2001**